No. 41,185

L. E. ANDERSON, RULON ANDERSON and ELDON ANDERSON, a Co-partnership, doing business under the name and style of BEST SEED COMPANY, *Appellees,* v. MARVIN THOMAS, *Appellant.*

(336 P. 2d 821)

Opinion filed March 7, 1959.

Daniel R. Hopkins, of Garden City, argued the cause, and Ray H. Calihan, Logan N. Green and Ray H. Calihan, Jr., all of Garden City, were with him on the brief for appellant.

A. M. Fleming, of Garden City, argued the cause, and Bert J. Vance, of Garden City, and Charles H. Fleming, of Scott City, were with him on the brief for appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by plaintiffs, a co-partnership engaged in the seed and feed business, against a farmer to recover actual damages claimed for an alleged breach of an express warranty in a written contract for the sale of certified Westland milo seed grown by the farmer. The alleged breach is failure to deliver certified Westland milo seed with germinative qualities of at least 80%.

The underlying question is whether the defendant (appellant) furnished seed of "Blue Tag Quality" specified in the written contract—certified Westland milo seed of germinative qualities of 80% or better—under the Agricultural Seed Laws of Kansas. Stated in other words, do the Kansas statutes relating to the sale and distribution of agricultural seeds impose some greater responsibility on the defendant than his common law liability for breach of an express warranty?

Upon issues joined by the pleadings the case was tried in the lower court to a jury. At the close of the plaintiffs' evidence the defendant interposed a demurrer to such evidence which was overruled. At the close of the defendant's evidence the plaintiffs interposed a demurrer to the defendant's evidence. The trial court sustained this demurrer and instructed the jury to return a verdict

for the plaintiffs in the sum of $6,809.66. Thereafter the defendant's motion for a new trial was overruled and he has duly perfected an appeal to this court from all adverse rulings.

Since the legal question here presented is basic in the growing and handling of agricultural seeds in Kansas, the material facts will be stated in considerable detail. The facts established by plaintiffs' evidence are not in dispute. It is appellant's position that plaintiffs (appellees) proved his case.

The plaintiffs are a co-partnership, doing business as Best Seed Company of Garden City, Kansas, having been engaged in the business of handling seed both at wholesale and retail since 1952. The defendant (appellant) is a farmer living in Scott County, Kansas, approximately five miles southwest of Scott City, Kansas. He has an irrigated farm with approximately 800 acres under irrigation. In the year 1955, the defendant undertook to raise certified Westland milo seed for sale on 160 acres of this land.

The ground on which the seed was to be raised had been prepared for the growing of certified Westland milo seed and had been in certified Westland milo the year before. In accordance with the methods prescribed by the Kansas Crop Improvement Association (hereafter referred to as KCIA), the official agency designated for the establishment of rules and regulations for the growing of certified seed, defendant obtained a certificate of inspection on that field and caused it to be inspected. The final inspection by the KCIA was made on October 18, 1955, at which time the field and the Westland milo growing thereon were approved by that agency and a certificate issued. Up to this point the defendant had met all requirements of the KCIA. The matters in controversy appear to have arisen after this date.

The plaintiffs consulted the defendant in the early part of November, 1955, concerning the purchase of his Westland milo seed. As a result of negotiations the parties entered into a written contract dated November 9, 1955. It is evidenced by a purchase confirmation form captioned "BEST SEED Co." By this document purchase was confirmed from Marvin Thomas, Scott City, Kansas, of 4,000 100-pound bags of *certified Westland milo* with purity of "Blue Tag Quality" for a price of $2.50 per hundredweight recleaned. Delivery was "f. o. b. grower's farm" to be completed January 31, 1956. The terms were "Payment upon completion of certification (advance payment on grower's request)." The re-

cleaning charges and new burlap bags were to be paid for by the "Buyer." An additional condition of the contract specified:

"Buyer to receive refusal on purchase of all remaining seed held by grower —(refusal shall mean that Buyer is to get option to purchase if he meets other competitive bids)—Grower to retain for his own use whatever amount of seed he needs—(Approx 200 bags of seed to be cleaned free for grower.)"

The contract was signed by L. E. Anderson and Marvin Thomas.

What the parties actually intended by this contract is clear from their interpretation of its provisions. It is uncontroverted that the contract called for delivery to the plaintiffs by the defendant at the defendant's farm of *bulk seed* meeting the standards for certification, Blue Tag Quality, the quantity after recleaning to equal 4,000 bags of 100 pounds each, said seed to be f. o. b. defendant's farm, to be hauled at the expense of the plaintiffs from said farm, to be cleaned (recleaned) by the plaintiffs at the expense of the plaintiffs, to be sacked by the plaintiffs at the expense of the plaintiffs, and to be tagged by the plaintiffs with certification tags furnished by the defendant. The other written provisions of the contract were clear.

The following allegation was made in the plaintiffs' petition and *admitted by the answer* of the defendant:

"That the term 'certified seeds,' as applied to seeds in Kansas, has a universal meaning in the seed trade, and refers to seeds that are certified by an agency designated by The Kansas State College of Agriculture and Applied Sciences for the certification of agricultural seeds pursuant to the provisions of Chapter 2, Article 14, of the General Statutes of Kansas, 1949, and amendments thereto. That at all times pertinent to this lawsuit, the Kansas Crop Improvement Association was the agency designated by The Kansas State College of Agriculture and Applied Sciences for the certification of Westland milo seeds within the State of Kansas, pursuant to said statute, and that it was contemplated by the parties that the certification of the seeds involved in this action should be made by said agency according to its Rules and Regulations, and the Rules and Regulations of the State Board of Agriculture. That it is also universally known in the seed trade in Kansas that the term 'Blue Tag Quality' means and refers to the standard or quality required by the Rules and Regulations of said The Kansas Crop Improvement Association of seeds in order to be eligible for certification. That at the time said contract was entered into and at all times pertinent hereto, The Kansas Crop Improvement Association's Rules and Regulations required that germination of milo seed be 80% or better in order to qualify for certification. That such facts were all well known to defendant."

On or about November 20, 1955, Rulon Anderson, one of the plaintiffs, visited the defendant's farm. There some discussion was had concerning the taking of a sample of the seed to be sent in to

the KCIA for testing to complete the certification. The defendant procured the sample bag supplied by the KCIA from his house and together the defendant and Rulon Anderson took a representative sample of the seed from a loaded truck which had just been harvested from the field. The defendant represented the load to be representative of the field and it appears that all of the facts were well known to the plaintiffs. Counsel for the plaintiffs in his opening statement said:

"That thereafter Marvin Thomas caused a *representative sample of this seed* to be tested in the State Seed Laboratories through the Kansas Crop Improvement Association . . ." (Emphasis added.)

This sample was taken by Rulon Anderson to Garden City and *run through a small hand cleaner belonging to the plaintiffs.* A small portion of the sample was tested and retained by the plaintiffs and the remainder forwarded to the KCIA in Manhattan and received there on November 21, 1955. There the sample was divided, a portion being retained and filed, and the remainder forwarded to the State Seed Testing Laboratory (hereafter Laboratory) in Topeka and received there November 22, 1955. At the Laboratory the sample was again divided, half was filed and half was tested at that time. The portion tested at that time showed a germination of 93% and was sufficient for certification in all other respects.

On February 20, 1956, the remainder of this sample of the seed in the Laboratory was tested and showed a germination of 83%. The portion retained by the KCIA was forwarded to the Laboratory and a test commenced January 28, 1956, showed a germination of 85%. The plaintiffs tested a portion of the sample which they retained in their own germinator immediately after procuring the sample and it showed a germination of 97%. These tests, all made on different portions of the *only* sample of the milo seed taken while it was in the possession of the defendant, consistently even after the passing of several months indicated germination of over 80%. The minimum standard for certification of Westland milo with respect to germination was and is 80%.

All the milo in question was harvested during November, 1955, and was stored on the defendant's farm in a quonset hut or in other bins which had been qualified for storage by the Commodity Credit Corporation. On the 14th day of December, 1955, the plaintiffs commenced hauling the seed from the defendant's farm to their place of business. The truck in which the seed was hauled was a farm truck owned by the plaintiffs. The hauling continued with

several interruptions at the rate of one or two truck loads per day until the hauling was completed the latter part of December. Except for 150 bags which were returned to the defendant under the provisions of the contract, he did not see the seed after it left his farm.

The seed when it reached the plaintiffs' place of business was dumped into the unloading pit from which the seed traveled to the cleaner. It was then cleaned and sacked in 100-pound bags and stacked in the warehouse. Before the first load of seed was dumped into the pit and cleaner, the bin and cleaner, but not the truck in which the seed was hauled, were inspected by a representative of the KCIA on December 15, 1955. Although the inspection was thorough it did not include an inspection for fungus since the presence of fungus could not have been ascertained by inspection. No further inspection of the equipment was made during the hauling and cleaning of the seed which is the subject of this lawsuit. It should be noted that the seed was cleaned in a large cleaner and not the small hand cleaner that was used by the plaintiffs to clean the earlier sample which was forwarded to the KCIA for testing. This is in complete violation of Section 12-1-21 of the regulations adopted by the KCIA.

Both the defendant and the plaintiffs testified that the seed at the time of delivery to the plaintiffs was dry and looked like good seed. L. E. Anderson, one of the plaintiffs, testified concerning this seed:

". . . We looked at this lot of seed when it came in. It looked good. There was no excess moisture. We had a dry fall that year. All of our milo ran dry that year. We did not make a moisture test of this particular seed. I did not observe any mold or fungus or anything on any of this seed."

The defendant at the request of the plaintiffs and on or about the 14th day of December, 1955, ordered 2,700 tags from the KCIA to be attached to the bags of seed. These were the *blue tags* indicating that certification had been completed. These labeling tags showed the seed to have been grown by Marvin Thomas of Scott City, Kansas; that the crop and variety was "WESTLAND GRAIN SORGHUM" identified by lot number, serial number and date of testing (11-29-55). The tag indicated purity of 99.50%, inert .50%, other crop seed .00%, germination of 93%, and no weed seeds. The foregoing tags were received by the defendant and picked up at the defendant's farm by one of the plaintiffs' employees. Later an additional 500 tags were ordered, received and picked up in the

same manner. On December 24, 1955, and for several days prior thereto the bags into which the seed had been placed, numbering 1,921, were sealed by a representative from the KCIA. At that time he placed the tags on those bags which had not then been tagged. The representative from the KCIA identified the seed as seed having been grown by Marvin Thomas only by virtue of the fact that *representatives of the plaintiffs* informed him of that fact. He also took samples from a representative number of such bags in accordance with the regulations, mixed the samples together and from that sample procured a sample which he forwarded to the KCIA on December 24, 1955. That sample, designated as a sealing sample, was filed in accordance with regulations in the files of the KCIA. Later, after a complaint had been received by the Board of Agriculture respecting this seed, and on January 27, 1956, that sample was forwarded to the Laboratory and tested for germination. It germinated 50%.

On January 9, 1956, and for several days prior thereto, the same representative from the KCIA sealed, tagged and sampled 1263 bags located at the Best Seed Company at Garden City, Kansas. Again he was informed as to the identity of that seed by representations of the plaintiffs or their employees. A sealing sample taken at the time was forwarded to the KCIA and there filed. It was forwarded to the Laboratory on January 27, 1956, and on testing germinated 59%.

During the latter part of December, 1955, and in January, 1956, the major portion of the bags so sealed and tagged were sold and delivered by plaintiffs to various purchasers. On January 27, 1956, a complaint was received from Coe Seed Company at Topeka, Kansas, that the seed contained in the bags was not germinating in accordance with the germination indicated on the tags. Stop sale orders were issued by the Board of Agriculture. At that time, the sealing samples previously mentioned were forwarded for testing with the results hereinabove indicated. The sample which had been retained by the KCIA from the original sample as well as that portion of the original sample retained by the Laboratory was also tested at that time as hereinabove indicated with the results heretofore set out. In addition, a state inspector came to Garden City and took samples of the seed at the Best Seed Company. Three separate samples were taken and forwarded to the Laboratory on February 3, February 24 and February 29, 1956. Those samples

germinated 56%, 53% and 59%, respectively. In addition, plaintiffs treated some of the seed which was still in their possession with Arasan, a fungicide, and forwarded a sample of the treated seed to the Laboratory on February 15, 1956. That sample germinated 67%. On germination tests, all samples of the seed except those samples taken while the seed was in the possession of the defendant and except the Arasan-treated sample, showed that the seeds which failed to germinate were moldy.

Plaintiffs took back the seed which had previously been sold and replaced it with other certified seed. The returned seed was sold as feed and plaintiffs sued to recover the losses sustained, including expenses of hauling bulk seed from the defendant's farm, cleaning 3,024 bags at 35 cents per bag, cost of 3,174 burlap bags at 20 cents each, expenses of hauling connected with picking up seed from plaintiffs' customers and replacing the same, the difference between the contract price of $2.50 per hundredweight of said 3,024 bags and the amount for which the plaintiffs were able to sell the same as feed, and the difference between the contract price of $2.50 for the 3,024 bags and the price plaintiffs were required to pay and did pay for other seed to replace the same. In other words, plaintiffs seek by their action to make the defendant an absolute insurer of their profits.

Wayne Fowler, Secretary-Treasurer of the KCIA, testified on direct examination as a witness for plaintiffs:

"Mold on the seed would be a growth of fungus, produced and as a result of first having the spores of the mold present and then placing them under favorable conditions of moisture and temperature for germination of those spores. Mold is a parasite which lives off the organism upon which it is growing. Since it is parasitic, it will take some of the food which was stored in that seed for use of the seedling or small plant and thereby rob that seedling of some of the food which it might need to produce a plant. I don't believe there is any direct effect on the vigor of the seed although it would reduce the vigor of the seedling. The seedling is the small plant that develops on germination of the seed. Mold would probably reduce the vigor and health of that seedling. Normally, practically all of the mold spores fall on the seed while it is still in the field in the open air because the air is full of these tiny spores we can't see, but they are present. They will fall on the surface of seeds and everything else and might probably be the greatest single source of mold spores. Generally speaking, mold would be favored by moist conditions and a certain amount of warmth or some heat. Moisture can be from an external source which in the field would be rain or dew, or something of that sort, or it can be the moisture which is internal to the seed. The seed before maturity has a considerable amount

of moisture and as it approaches maturity the moisture content of the seed is reduced so the moisture for mold growth could come from external sources or sources internal to the seed. Generally, the presence of excess moisture will cause the development of higher temperatures. Unless provision was made for reducing the moisture content of that seed or grain before storage, there probably would be heating and perhaps even spoilage in storage. If it were severe enough, mold might develop right in the storage bin in such seed. Common molds would not be expected to develop without excess moisture or heat. A strong, vigorous seed, which has developed normally and grown normally, would be somewhat less likely to be attacked by mold than a seed which had not developed normally during its growing period. . . ."

He further testified on cross examination:

". . . Fungus also develops sometimes on the seed while in storage. It sometimes gets into the seed from the cleaning equipment. It sometimes develops in the laboratory itself. Another possible source would be from the hauling truck. If the seed has excessive moisture, and other conditions such as a sufficient warmth are present, that is conducive to mold growth. *I testified on direct examination that none of the reports submitted by our inspectors indicated any moisture. . . .*" (Emphasis added.)

Appellees in their brief state the only disputed issue in this case is that the certified Westland milo seed delivered to plaintiffs pursuant to the contract, did not, *at all pertinent times involved,* hold up to 80% germination.

The appellees alleged in their petition:

". . . That, in truth and fact, the germination of said seeds was not 80% at the time of delivery or *within nine months of the date of the test shown on the tags,* and they were not eligible for certification, contrary to the express terms of the contract; that said deficient germination was a latent defect not discoverable by plaintiffs by reasonable inspection, and that plaintiffs accepted and paid defendant for said seeds in reliance upon the truth of the matters stated on said tags. That plaintiffs paid defendant for said seeds sums totaling $7,560.00, the last payment being made January 4, 1956." (Emphasis added.)

Appellees rely upon section 4-2-13 of the regulations of the Kansas State Board of Agriculture to support their allegation that germination of this seed must remain at least 80% for a period of nine months to be of Blue Tag Quality. It reads:

"DATE OF TEST. The label shall show the month and the year in which the germination test was completed. No more than nine calendar months shall have elapsed between the last day of the month in which the germination test was completed and the date of sale, offering or exposing for sale, or exchange of the agricultural seed."

Appellees' theory of the law, as we read their brief, seems to be that the producer of certified Westland milo seed, whose name ap-

pears on the "Blue Tag," is absolutely liable for all damages to a purchaser on each and every sale of such seed if the germination does not hold up to 80% so long as it is offered for sale as seed, regardless of whether the sale is to a processor, a middleman or a grower, even though such seed may be completely beyond the control of the producer and under circumstances which would permit the purchaser to mishandle, mix or otherwise wrongfully store and dispose of the seed. Appellees contend the Agricultural Seed Laws of Kansas are a part of the contract.

This action was brought and tried on the theory of a breach of an express warranty. The Uniform Sales Act, Section 14, which has not been adopted by Kansas, is merely declaratory of the common law and as such has become the law in this jurisdiction. (See, *Stegman v. Offerle Coop. Grain and Supply Co.,* 151 Kan. 655, 100 P. 2d 635.) It provides that where there is a contract to sell or a "sale of goods by description, there is an implied warranty that the goods shall correspond with the description." Samuel Williston in his work on Sales in discussing the provisions of this section says:

"It is customary to call a warranty in a sale by description an implied warranty, and for that reason this nomenclature has been preserved in this section of the Sales Act. *The warranty might more properly, however, be called express, since it is based on the language of the parties.*" (1 Williston, Sales, [Rev. Ed.] § 223, p. 571.) (Emphasis added.)

To crystallize the issues presented we shall first approach this case strictly upon the theory of common law liability, wholly aside from any effect which the Agricultural Seed Laws of this state may have upon the contract. With this assumption, the immediate question for determination is whether or not the plaintiffs have sustained the burden of proving a breach of warranty consisting of the defendant's failure to deliver certified Westland milo by reason of the germination of that seed at percentages less than required for certification.

The burden of proof is on the party relying upon a breach of warranty to show the warranty, the breach thereof, and that his loss resulted from the breach of such warranty. (77 C. J. S., Sales, § 365, pp. 1283, 1284; and 46 Am. Jur., Sales, § 309, p. 490.) The duty of the defendant under the contract extended no further than to comply with its terms.

The evidence of the plaintiffs proved that inspections were made, that the field and the ripened sorghum passed inspection, and a certificate was issued. They proved that a *representative sample*

of the seed was taken in which plaintiffs participated. This was established by direct testimony and by admission in the opening statement. They proved that the *only sample taken* while the seed was in the possession of the defendant was run through plaintiffs' own hand cleaner (a violation of KCIA regulations in which plaintiffs participated), and that their own germination test of a portion of this sample indicated 97% germination. They proved that they forwarded in defendant's name, a portion of that sample to the KCIA, and that such sample on three different tests, one given immediately and the others given at later dates, all revealed sufficient germination for certification. They proved that certification of this seed was completed by issuance of a certificate. They further proved that the defendant procured the tags to be placed on the bags. They proved the contract between the parties, the obligations of the parties under the contract, the fulfillment by the defendant of his obligations under the contract, and the payment to him of the money due. In addition, they proved that when the seed was delivered to them it looked good and did not contain excessive moisture; that it was in such good condition they did not consider it necessary to take moisture tests or to dry it or to protect it by treatment.

Plaintiffs then undertook to show, after they had hauled the seed to Garden City to their own place of business, in their own trucks, dumped it into their own pit, ran it through their own cleaner and had themselves sacked the seed, that the samples taken while the seed was in their possession and under their control, and tested more than a month after delivery, showed germination of less than 80%.

Plaintiffs' evidence established that both they and the defendant were thoroughly familiar with the rules and regulations of the KCIA in the production and processing of certified sorghum seed, and that plaintiffs as seed dealers were thoroughly familiar with the method and process used to protect seed from fungus growth by the use of Arasan. The reasons given by plaintiffs for failure to treat the seed, aside from the fact that they considered it unnecessary by reason of its dry condition, were that it cost 35 cents per 100-pound bag to treat it, that normally they did not keep the seed very long as wholesalers anyway, and that if it were treated and could not be sold for seed it would have no value as feed. Plaintiffs' admitted treatment to control fungus for their

area in the state was recommended by the Agricultural Experiment Station.

Wholly aside from any obligations which the Agricultural Seed Laws of this state may impose in the instant case, the evidence of the plaintiffs, as viewed on demurrer, was insufficient to establish defendant's failure to deliver certified Westland milo seed with germinative qualities of at least 80% in accordance with the written terms of the contract. Therefore, under the common law rules of liability for breach of an express warranty, the defendant's demurrer to the evidence of the plaintiffs should have been sustained.

Appellees assert in their brief that the seed lacked vigor and was too weak to stand up to certification tests. Insofar as this statement could be interpreted to mean that the seed lacked vigor when it was delivered to the plaintiffs (appellees) it requires attention. It must be borne in mind that appellees admitted that a representative sample of the seed was taken and submited to the KCIA, after the contract was signed and while the seed was still in the possession of the defendant, and that final certification was completed as a result of the thorough cleaning in a *small hand cleaner* and the testing of this sample on November 29, 1955. This was before delivery of the certified milo seed to the appellees, which started on December 14, 1955. Appellees' admissions, by testimony and through counsel in his opening statement, were made in the trial court. Here they attempt to shift positions and say the sample was only representative of the truck load from which the sample was taken. Nevertheless they are bound by the record presented. An admission by counsel relating to the trial of a case is conclusive and cannot be retracted in subsequent proceedings. *(In re Estate of Carrell,* 183 Kan. 491, 327 P. 2d 883.) A party is bound by the theory upon which the case was submitted to the trial court. *(Oliver v. Nugen,* 180 Kan. 823, 308 P. 2d 132.)

What effect do the Agricultural Seed Laws of Kansas have upon the transaction in the instant case?

Generally speaking, the facts here presented indicate the manner in which most certified agricultural seeds in Kansas are *produced and processed* for sale under the rules and regulations of the Kansas Crop Improvement Association (KCIA), except for the violations heretofore disclosed. The seed dealers or wholesalers of seed superimpose their business upon the growers who become members of the KCIA for the purpose of growing certified seed. The

seed crop is grown by the farmer in compliance with the standards and requirements specified in the KCIA regulations. The seed dealers or wholesalers of seed purchase the harvested seed in bulk from the producer at roughly 50% or less of the market value at which it ultimately retails to the one purchasing for planting or seeding purposes. They process the seed and the grower is required by the contract to co-operate to complete certification. The grower's name and address appears as producer on the Blue Tag with which the certified agricultural seed is labeled.

The Agricultural Seed Laws (G. S. 1949, Ch. 2, Art. 14) have been before this court only once since the original act was passed in 1925. The original act was repealed and new legislation enacted in 1935, which now appears as G. S. 1949, 2-1415, *et seq.* The case of *Stegman v. Offerle Coop. Grain and Supply Co.,* 151 Kan. 655, 100 P. 2d 635, was decided by this court in 1940. There an action was brought to recover damages for the alleged breach of an implied warranty of variety and fitness. A farmer purchased spring barley seed from a seed dealer and was given winter barley seed instead. It failed to produce grain when seeded in the spring. The seed company knew the farmer intended to plant it as spring seed barley at the time he purchased it, and the farmer knew the barley had not been tested for seed purposes as required by statute at the time he purchased it. Pertinent to the issues herein are Syllabi ¶¶ 1 and 2 which accurately reflect the law stated in the opinion:

"1. Where one sells grain for seed, knowing the purchaser desires to use it *at once* for that purpose, there is an implied warranty it is suitable for that purpose.

"2. Our statute (G. S. 1935, 2-1416, *et seq.*), making it unlawful for one to sell agricultural seed *for planting or seeding purposes* that has not been tested and labeled, as therein provided, and fixing penalties for its violation, is designed for the benefit of the purchaser. Such purchaser, even though he knows the seed has not been so tested and labeled, is not deprived of *any remedy he has against the seller* on the ground that he is in *pari delicto* with the seller in violating the law." (Emphasis added.)

Syllabus ¶ 1 above is merely declaratory of the common law. The opinion states the general rule as given in the syllabus and cites numerous authorities to support it. It does not purport to be a statutory remedy and nowhere in the opinion is there anything to indicate the contrary. Reference in Syllabus ¶ 2 to "any remedy he [the purchaser] has against the seller" is further recognition of his rights under the common law.

Appellees contend that the *Stegman* case has placed an interpretation upon G. S. 1949, 2-1416, *et seq.*, which protects *all purchasers* of seed where it has not been tested and labeled as required by the act. This is based upon the statement in Syllabus ¶ 2 that the statute is designed for the benefit of the *purchaser,* and to similar language in the opinion where the term "buyers" was used. In the opinion the court said:

". . . Our statute requiring the seller of grain for seed or seeding purposes to test and label the same, or incur penalties, is a statute obviously designed for the benefit or protection of *buyers. The statute attaches no penalty against the purchaser of seed under such circumstances,* and to do so would in fact destroy the purposes of the act." (p. 657.) (Emphasis added.)

Obviously, the court in the *Stegman* case was not confronted with any distinction between purchasers (or buyers). On the facts which the court specifically had before it, a *farmer* purchased the spring seed barley *for seeding purposes.* This is clearly indicated by the use of the expression "at once" in Syllabus ¶ 1, and the expression "for planting or seeding purposes" in Syllabus ¶ 2 of the *Stegman* case. Therefore, the law in the *Stegman* case is strictly confined to the wording of the statute where a sale is made to a *purchaser for planting or seeding purposes.*

It must further be observed that reference to the act in the *Stegman* case as a "statute obviously designed for the benefit or protection of buyers" was made to overcome the seed dealer's contention that the farmer knew the barley seed had not been tested for seed purposes as required by statute and therefore assisted in violating the statute; that this was a penal statute (G. S. 1935, 2-1422), hence, the farmer assisted him in committing an offense under the laws of our state; and that the farmer stood in *pari delicto* with him and could not recover for that reason. Reference by the court to penalties in the opinion was strictly limited to criminal liability under the statute. The farmer's knowledge that the provisions of the statute had not been met were held not to foreclose his rights to proceed against the seed dealer in a civil action *by asserting his common law remedy* because the act was obviously designed for the benefit or protection of those who purchased agricultural seed for planting or seeding purposes.

Does the act protect one who purchases agricultural seed for the *purpose of being processed* and who knows that such agricultural seed is to be tested and labeled before such seed is offered or exposed for sale, sold or exchanged *for planting or seeding purposes?*

G. S. 1949, 2-1415, defines agricultural seed as follows:

"(1) The term 'agricultural seed' as used in this act shall be held to mean the seed of all field and pasture crops, or mixtures thereof, such as . . . the grain sorghums . . . when held for sale, offered for sale, sold or exchanged *for the purpose of being processed, planted or seeded.*

. . . . . . . . . . .

"(3) *The term 'processed' shall be held to mean cleaned, blended, or tested to meet the requirements of agricultural seed for the purpose of being planted or seeded."* (Emphasis added.)

The provisions of G. S. 1949, 2-1416, require testing and labeling as follows:

"It shall be unlawful for any person, association of persons, or corporation to offer or expose for sale, sell or exchange any agricultural seed *for planting or seeding purposes that has not been tested and is not labeled as herein provided.* This provision shall apply to grain when sold as such or when sold according to grain standards and the seller knows, or has reason to know, it is to be used for seed." (Emphasis added.)

While 2-1415, *supra,* in defining *agricultural seed* includes that which is held or offered for sale, sold or exchanged *for the purpose of being processed,* the provisions of 2-1416, *supra,* which require the *testing and labeling* do not require the seed to be labeled when it is held or offered for sale or sold or exchanged for the *purpose of processing.* In fact, the provisions (2-1416, *supra*) require that the agricultural seed be *tested and labeled* as required by the act before such seed is held or offered for sale or sold or exchanged *for the purpose of planting or seeding.* The statutory definition of the term "processed" fortifies this interpretation of the act. Obviously, agricultural seed cannot be labeled under the act until it is processed. The *testing* of agricultural seed is included within the meaning of the term *"processed."* Thus, contrary to appellees' contention, the appellant was not in violation of 2-1416, *supra,* by selling seed under a written contract to the appellees which had not been tested or labeled.

That this interpretation is correct is further indicated by the provisions of G. S. 1949, 2-1417, which define "tested seeds" and specify how tested agricultural seed shall be labeled or branded, as follows:

" 'Tested seed' shall be held to mean that a *representative sample* of the lot of agricultural seed in question has been subjected to examination and its character as to purity and germination determined. Each and every bulk lot, package, or parcel of tested agricultural seed, offered or exposed for sale, sold or exchanged *for planting or seeding purposes* shall have a statement, commonly known as the label, affixed thereto or printed or stenciled thereon,

in the English language, showing: *(a)* The commonly accepted name or kind of seed therein. *(b)* The percentage by weight of purity. *(c)* The percentage by weight of all weed seeds. *(d)* The percentage by weight of all inert material. *(e)* The percentage of germination, which percentage shall not include the hard seed in legumes. *(f)* The percentage of hard seeds. *(g)* The date of germination test. *(h)* The locality (state and county) where grown or a declaration that origin of seed is unknown to seller. *(i)* A name, letter, number or mark to designate the lot of which the bulk or package so labeled is all or a part. *(j)* The name or names and the number of all weed seeds as provided in section 4 [2-1418]. *(k)* The name and principal address of person, association of persons, or corporation responsible for such statement." (Emphasis added.)

Appellant in the instant case was not selling or exposing for sale agricultural seed for planting or seeding purposes within the meaning of the act. The appellees purchased the bulk seed for processing and resale under the act or whatever disposition they desired to make of it.

The act sets forth what are deemed violations in G. S. 1949, 2-1421. It reads:

"It shall be a violation of this act for any person, association of persons, or corporation to offer or expose for sale, sell or exchange any agricultural seed which is mislabeled within the meaning of this act. Agricultural seed, mixed or unmixed, tested or untested, shall be deemed to be mislabeled if not labeled as herein provided, when sold, offered for sale, or exchanged, or if the label be incomplete, or if the label be false in any respect, or if not in full compliance with the provisions of this act: *Provided,* That it shall not be violation of this act for the grower of agricultural seed to sell on his premises for planting or seeding, corn, sorghum, kafir, wheat or rye which is not tested and labeled when both the grower and the planter know that the seed grown on his land is free from the weeds named in accordance to provisions as contained in section 4 [2-1418] of this act."

The regulations of the Kansas State Board of Agriculture have undertaken to define the terms in the statute. Section 4-2-29 requires retesting and relabeling of old seed (agricultural seed held for more than nine months from the date of test shown on the label), and section 4-2-33 provides:

"SEED OFFERED FOR SALE. Agricultural seeds whether in bags, cartons, bins or other containers exposed in salesrooms, storerooms, warehouses, *or other places where seeds are sold for sowing purposes,* shall be considered as seed offered or exposed for sale for *planting purposes* and subject to the provisions of the Act, *unless clearly labeled otherwise."* (Emphasis added.)

Obviously, under the act the agricultural seed here in question had not been mislabeled when appellant sold it to the appellees.

At that point it had not been labeled at all. There was no requirement that it be labeled when sold for the purpose of processing. Under the contract it was appellees' duty to process the seed. If appellant's co-operation in procuring final certification of this agricultural seed can be regarded as labeling it, then *as between the parties to the contract* appellant complied with the act. At that point the agricultural seed was properly labeled as certified Westland grain sorghum pursuant to the testing of a representative sample in accordance with the provisions of G. S. 1949, 2-1417. At no time did the appellant expose the agricultural seed, while it was in his possession, in a salesroom, a storeroom, a warehouse, or other place where seeds are sold for sowing purposes. Therefore, the statute even with respect to its penal provisions (G. S. 1949, 2-1422) did not extend to this transaction and did not extend to the appellant.

Absent the requisite intention a criminal act is not committed. Clearly, if it had been intended in the instant action to base the claim for damages on fraud or deceit in the sale of the seed as having been falsely labeled (mislabeled under 2-1421, *supra*) it would have been necessary to allege scienter, because an innocent mistake is not *mala prohibitum.* (See, *Graham v. John R. Watts & Son,* 238 Ky. 96, 36 S. W. 2d 859). No such allegations appear in the petition. The action is not *ex delicto,* but *ex contractu* for alleged breach of an express warranty.

The title to the basic Agricultural Seed Act which is Chapter 4 of the Laws of 1935, reads as follows:

"AN ACT *regulating the sale and distribution of agricultural seed,* defining agricultural seed, prohibiting the sale of certain seed, limiting the purity of tested seed salable for planting or seeding, providing for the labeling of seed, *declaring certain violations of this act to be a misdemeanor and providing penalties therefor,* providing for inspection and analysis of seed, authorizing the state board of agriculture to make rules and regulations to carry out the provisions of this act, making an appropriation of funds for the administration of this act, and repealing sections 2-1401 to 2-1414 both sections inclusive, of the Revised Statutes Supplement of 1933." (Emphasis added.)

This language clearly shows that the act was intended to be regulatory and penal and that it did not purport to establish any new rule of civil liability for the breach of express or implied warranties in the sale of agricultural seed. None of the provisions of the act is more comprehensive than the title. The first three sections have been quoted. Section 4 provides that seeds containing noxious

weed seeds shall not be salable and further provides limitations upon the sale of seed containing certain other weed seeeds. Section 6 defines what shall constitute mixed seed. Section 7 provides what are deemed violations of the act (heretofore quoted). Section 8 provides that persons who shall violate the provisions of the act shall be deemed guilty of a misdemeanor and provides the punishment therefor. By the Laws of 1949 (G. S. 1949, 2-1422a) a section was added making mislabeled seeds a common nuisance and subject to seizure. It also provides that violations of the act "may be enjoined in a court of competent jurisdiction without filing of any other civil or criminal action." Section 9 authorizes inspection and sampling by the secretary of the State Board of Agriculture or his agents to determine the purity and germination of agricultural seed, and further authorizes the secretary or his agents to stop the sale or movement of any agricultural seed found to be in violation of the provisions of the act; it also provides for the establishment and maintenance of a seed laboratory; it further gives the secretary or his agents free access to all places where agricultural seed may be found. Section 10 prescribes the procedure when the act is violated. Section 11 relates to the testing of samples. Section 12 relates to reports. Section 13 empowers the State Board of Agriculture to make and publish rules and regulations; and Section 14 makes provision for appropriation to the State Board of Agriculture out of funds in the State Treasury.

Courts should give full effect to the expressed purposes of legislative enactments, but it would carry construction rather far to read provisions for civil liability into a statute which actually omits them while expressly providing for criminal liability, especially when the legislature could easily have inserted provisions for civil recovery had it chosen to do so. By the Laws of 1949 the legislature did authorize violations of the act to be enjoined without the filing of any other civil or criminal action. This is another express provision of the legislature upon further consideration of the act, and its further omission of specific provision for civil liability becomes conspicuous for its absence. Since purchasers of agricultural seed are entitled to rely upon warranties, express or implied, it must be assumed that the legislature intended the common law remedies for civil liability to be adequate—an action on the contract for breach of express or implied warranties, or an action in tort for fraud or deception. (See, *Graham v. John R. Watts & Son,* supra; *Rich v.*

*New York Cent. & Hud. Riv. R. R. Co.,* 87 N. Y. 382; and 1 Cooley on Torts [4th Ed.], Ch. 3, § 60, pp. 170, 171.)

The foregoing interpretation of the Kansas Seed Law (G. S. 1949, 2-1415 to 2-1428, inclusive) is consistent with the interpretation other jurisdictions have placed upon their Agricultural Seed Laws which are similar in wording to the Kansas act. Thus, in *Henderson v. Berce,* 142 Me. 242, 50 A. 2d 45, 168 A. L. R. 572, the court said:

"The language of the act clearly shows that it was intended to be regulatory, and penal only if the act was knowingly or wilfully violated. It does not purport to establish any new rule of civil liability for the breach of an express or implied warranty in the sale of certified seed potatoes. Section four defines the term certified seed and names the agricultural seeds which are to be included within its provisions. When the grower has complied with sections five, six and seven the seeds then appear in commerce as certified seed potatoes. Without performing the conditions set forth in sections five, six and seven the seeds do not qualify for certification. Knowingly and wilfully disregarding these sections subjects the seller to a fine and denial of the privileges of this statute.

". . . The statute does not provide any remedy for the buyer if the seeds are not as represented by the certificate . . ." (p. 248.)

The Supreme Court of Oklahoma in *Manglesdorf Seed Co. v. Busby,* 118 Okla. 255, 247 Pac. 410, construed its "Pure Seed Law." The ruling of the court is clearly indicated in the first syllabus which states:

"Chapter 138, S. L. 1919, known as the Pure Seed Law, is a regulatory and penal statute designed primarily to protect the citizens of this state from the propagation and spread of noxious weeds and plants through their intermixture with agricultural and garden seed, and none of its provisions were intended to, or do, create any new rule of civil liability for breach of express or implied warranty in the sale of personalty."

Is the transaction in the instant case affected by the legislative act relating to the certification of seeds or the regulations adopted pursuant thereto?

The Laws of 1937, Chapter 3 (G. S. 1949, 2-1429 to 2-1440, inclusive) in general authorize the Kansas State College of Agriculture and Applied Science to designate an agency or agencies for the purpose of setting standards and making requirements for the certification of seeds. Pursuant thereto the KCIA has been designated as the agency, and it is empowered by the act to make rules and regulations necessary to carry out the intent and purposes of the act.

Material to our discussion is G. S. 1949, 2-1439, which provides:

"Nothing contained in this act shall be construed to affect any of the provisions of the Kansas seed law as set forth in sections 2-1415 to 2-1428, inclusive, of the General Statutes of 1935."

The act is enforced by granting powers to the agency (KCIA) to withhold certification from any grower of seeds who is engaged in or attempts to engage in dishonest practices for the purpose of evading the provisions of the act, including the standards, rules and regulations adopted. Unlawful acts and penal provisions are set forth in G. S. 1949, 2-1438, as follows:

"It shall be unlawful for any person, firm, association or corporation to issue, make, use or circulate any certification, or evidence of certification as defined in this act, without the authority and approval of the duly authorized agency or agencies of the Kansas state college of agriculture and applied science as herein provided. Every person, firm, association, or corporation who shall violate *any of the provisions of this act, or any of the rules and regulations based hereon, shall be deemed guilty of a misdemeanor* and upon conviction thereof shall be fined in any sum not exceeding five hundred dollars or a jail sentence of not more than sixty days, or both." (Emphasis added.)

Regulations pertinent to the instant case provide that responsibility for any obligation, other than those concerned with certification, arising from the sale or shipment of seed which has been certified rests with the *grower or subsequent handler making the sale or shipment* (KCIA regulation 12-1-15). To retain the eligibility of seed for certification *that is to be transferred in the unprocessed form* it is necessary to notify the KCIA in advance of the transfer, thereby enabling the KCIA to retain the identity of the seed during the transfer (KCIA regulation 12-1-19). Seed cannot be cleaned in public cleaners or custom cleaners and certification retained unless a representative of the KCIA has inspected the machinery before cleaning commences (KCIA regulation 12-1-20).

It is readily apparent from the act that the Kansas Seed Law is not affected in any way and that under the regulations parties are free to contract and sell seed in its unprocessed form without losing eligibility for certification of the seed. The above regulations require no clarification. None of the foregoing provisions purports to alter or change the civil liability of parties growing out of their contractual relationship in the sale of agricultural seed. Again this act is regulatory and penal in its nature.

Regulation 12-1-21 of the KCIA provides in part:

"Sampling. A cleaned, threshed sample of seed must be sent to the Kansas Crop Improvement Association for laboratory purity and germination tests. The amount cleaned for securing the sample should be the entire lot of seed or not less than 20 bushels. Care should be taken to see that this sample is cleaned with the same screens and by running and feeding the cleaner at the same rate that it is expected to be used for all seed of the same lot prepared for sale. *The grower is responsible for the information which he uses in labeling his seed.* It is therefore, to his interest to secure a representative sample." (Emphasis added.)

If the italicized portion of the foregoing regulation is intended to impose a new rule for civil liability, it goes beyond the authority of the act pursuant to which the regulation was promulgated. Properly construed, however, it appears to go no further than to recognize the grower's responsibility for the information disclosed on the label *which he affixes to his seed.* Once labeled, it represents an express warranty to the purchaser that the certified seed *at the time of delivery* under a contract of sale is in accordance with the description in all respects.

Having concluded that the Agricultural Seed Laws of Kansas do not purport to establish any new rule of civil liability for the breach of an express or implied warranty in the sale of certified agricultural seed, the decision in the instant case is controlled by common law rules of liability for breach of an express warranty.

While under normal circumstances the certification of seed as represented by the label will hold for a fairly long period of time, the rules of the State Board of Agriculture recognize that there is nothing absolute about seed holding its germination. Normally certification as to germinative qualities will hold for a period of at least nine months during which certification is good. Obviously, if agricultural seed is to retain its germinative qualities above minimum requirements for certification, practices commensurate with the best known methods in the seed business for the particular area are required in the processing, handling and storage of the seed prior to its ultimate use for planting or seeding. We therefore hold that certification as to the germinative qualities of agricultural seed speaks only as of the date of testing for germination, and upon sale a purchaser is entitled to rely upon the label as to germinative qualities, within normal limits of tolerance, as an express warranty from his vendor *at the time of delivery only.* Such deterioration of germinative qualities as may occur after delivery of certified

agricultural seed upon sale is the responsibility of the purchaser. He is required to take the necessary steps to preserve the germinative qualities while such seed is in his possession and control. In other words, where certified agricultural seed is sold, absolute liability is not imposed upon the grower of such seed in the event germination falls below the percentage indicated on the "Blue Tag" after delivery thereof by the grower to the purchaser. Under these circumstances the handling, storage and control of such seed is beyond the grower's control. The burden of proof is therefor upon the purchaser to show that at the time he accepted delivery of certified agricultural seed it was not as expressly warranted on the label concerning its germination. It must be understood in labeling agricultural seed that any specific percentage figure with reference to germination is always subject to variation within normal limits of tolerance customarily recognized in the seed business.

In this case, appellees undertook by their contract to perform some of the steps necessary for the certification of this seed. They undertook to haul it in bulk, to clean it, to sack it, to cause it to be sealed, and to cause the "Blue Tags" to be placed thereon. It was not until those acts had been performed that the seed was fully processed and labeled as required by the provisions of G. S. 1949, 2-1417. It was then fully processed and certified under the rules and regulations of the KCIA and ready for sale for the purpose of planting or seeding. Before the time that appellees undertook their obligations under the contract, the appellant had performed all of his obligations under the contract. During the period of time when the appellees undertook to perform their obligations under the contract they had exclusive control of the seed. What acts they did to cause the defects which later existed appellant, of course, does not know. Appellees' evidence definitely established that the representative sample of seed, taken while it was in the appellant's possession and cleaned on a small hand cleaner, stood up consistently to minimum germination requirements, while after appellees acquired possession of the seed, cleaned it on their commercial cleaner and handled it in their place of business, the germinative qualities, tested approximately thirty days after delivery, were below minimum requirements for certification. The cleaning was the appellees' responsibility under the contract. The appellees' proof showed that when the seed left the appellant's possession it was good seed sufficient for certification, needing only

the acts which the appellees had undertaken to perform to complete the certification.

A contract in which a seed company purchased seed eligible for certification and assumed the responsibility for cleaning is emphatically illustrated by a decision of the New Mexico Supreme Court in *Anderson-Thompson, Inc. v. Calley*, 60 N. M. 496, 292 P. 2d 990. There a seed company purchased a crop of certified sweet sudan seed "subject to final certification at 12 cents for the thresher run seed at thresher." The buyer was to stand the expense of "hauling, cleanout, cleaning & bagging & cost of certified tag & seals." The contract had a specific provision regarding germination but this was not the source of complaint. Recision of the contract was sought on the ground that the sudan seed was contaminated with noxious weed seed. The buyer contended that notwithstanding the terms of the contract, there was an implied warranty that the crop was free from noxious seed. The evidence was abundant that had the seed been thoroughly cleaned, there would have been no difficulty in meeting the test of certification and the seller was expressly denied the right to clean the seed. In the cleaning there was an unusual "clean-out" (approximately 25%) at the time the seed failed to meet the test, but the court held the contract alone was controlling, that no warranty was granted and the buyer was not in a position to rely on the principle of implied warranty as to freedom of the seed from noxious weed seed. The buyer was held to have assumed the obligation for the "clean-out" and "cleaning."

Reference to the New Mexico case should not be construed as an approval by this court of the noxious weed feature in that case. Whether this court would rule a case in the same way where noxious weed seeds infested agricultural seed sold in the unprocessed form under the Kansas Agricultural Seed Laws remains an open question.

We shall next consider the violation of the sampling regulation of the KCIA concerning the agricultural seed in question.

It is apparent the transaction between the parties in the instant case does not fit clearly into either of the alternative situations covered by the KCIA regulations—(a) an outright sale of unprocessed seed or (b) custom cleaning by the grower. Appellees sought by the contract to purchase Westland milo seed capable of final certification by the KCIA at a *bulk price* without assuming any financial

obligation should the seed fail to qualify for final certification upon testing of a representative sample. Bearing upon the point is the testimony of L. E. Anderson, one of the appellees, who said:

". . . We couldn't clean this seed until certification had been completed or until, not necessarily certification had been completed, until the tags had been prepared because we sew our tags into the bags . . ."

Furthermore, appellees' testimony was that they began selling the seed wholesale immediately after the contract was signed by telephone and at a seed convention in Wichita in the latter part of November, 1955. Under these circumstances, the parties violated the sampling regulation by taking a small sample which appellees caused to be cleaned on a small hand cleaner. It could hardly be urged by the appellees that they were without guilt in this violation, having full knowledge of the certified seed laws and regulations adopted pursuant thereto. The Certified Seed Act being adjunct to the Kansas Seed Act was not designed to protect one who purchased agricultural seed for the purpose of processing. Clearly under the regulations of the KCIA the purchaser of unprocessed seed would be subject to the penal provisions of the act in completing certification of the agricultural seed purchased.

Thus, it may be said, where the grower of certified agricultural seed enters into a written contract for the sale of such seed with a seed company for the purpose of processing prior to resale, the transaction itself being legitimate, and together the parties knowingly violate a regulation of the KCIA in selecting and sending a representative sample of such seed to the KCIA for testing at the State Seed Laboratory, the seed company is estopped, as between the parties, to assert the grower's violation of such regulation in a subsequent action to recover payments made to the grower in reliance on the results of testing such sample. It has been held that payments of money made with full knowledge of all the facts are in the nature of estoppels, and bind the persons making them to an admission of the validity of the debt. (*McLane v. Allison,* 60 Kan. 441, 56 Pac. 747.)

The evidence of the appellant in the trial court did little more than confirm the evidence presented by the appellees. It therefore follows that the trial court erred in sustaining the appellees' demurrer to the appellant's evidence, and in overruling the appellant's demurrer to the appellees' evidence, which it should have sustained.

It may be observed that the appellant did not, after introducing his evidence and at the close of all the evidence, move the court for a directed verdict. In *Ziegelasch v. Durr,* 183 Kan. 233, 326 P. 2d 295, the court held that where defendant's demurrer to the plaintiff's evidence is overruled, and defendant elects to intro-duce evidence on his own behalf, the question of whether the case should be submitted to the jury at the close of all the evidence depends upon a consideration of all the evidence produced by the parties. Under such circumstances, defendant must again raise the sufficiency of the evidence by motion for a directed verdict or be deemed to have waived the sufficiency of plaintiff's evidence as raised by his former demurrer. This was followed in *Ogilvie v. Mangels,* 183 Kan. 733, 332 P. 2d 581.

Here, however, the appellees (plaintiffs) interposed a demurrer to the appellant's (defendant's) evidence at the close of all the evidence and moved the trial court for a directed verdict. This challenged the attention of the trial court to the sufficiency of all the evidence to go to a jury, the legal effect of which was to supply the defect. (See, G. S. 1949, 60-3317.) It is clear the trial court in determining the sufficiency of all the evidence adopted an erroneous theory of the law in ruling the case.

The judgment of the trial court is reversed with directions to enter judgment for the defendant below.

ROBB, J. (concurring in part and dissenting in part): I concur in the result of that part of the opinion reversing the judgment of the trial court and dissent from that portion of the opinion whereby the judgment is rendered in favor of the defendant by this court for the reason that I think only a new trial should have been granted.

WERTZ, J., joins in the above concurring and dissenting opinion.