# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

### 2023 ND 37

John D. Miller, Jr. d/b/a John Miller Farms, Inc.

and JD Miller, Inc.,          Plaintiffs, Appellees, and Cross-Appellants

      v.

Nodak Insurance Company,       Defendant, Appellant, and Cross-Appellee

### No. 20210341

Appeal from the District Court of Walsh County, Northeast Judicial District, the Honorable Barbara L. Whelan, Judge.

REVERSED.

Opinion of the Court by Jensen, Chief Justice, in which Justices Crothers, Tufte, and Bahr joined. District Judge El-Dweek filed a dissenting opinion.

Benjamin J. Williams (argued) and Brayden K. Harwood (appeared), Fargo, ND, for plaintiffs, appellees, and cross-appellants.

Scott K. Porsborg (aruged) and Austin T. Lafferty (appeared), Bismarck, ND, for defendant, appellant, and cross-appellee.

**Jensen, Chief Justice.**

[¶1]   Nodak Insurance Company ("Nodak") appeals, and John D. Miller, Jr. d/b/a John Miller Farms, Inc. and JD Miller, Inc. (collectively, "Miller") cross-appeals from a judgment determining Miller's insurance policy with Nodak provided coverage and awarding Miller damages. Because we conclude a policy exclusion applies and precludes coverage, we reverse.

I

[¶2]   This insurance coverage dispute arises out of Miller's sale of seed potatoes to Johnson Farming Association, Inc. ("Johnson"). Miller operates a farm in Minto, North Dakota. At the relevant time period, Miller was insured by a Farm and Ranch policy and Excess Liability policy issued by Nodak.

[¶3]   During the 2015 planting season, Miller planted seed potatoes. Miller asserts a North Dakota State Seed Department representative inspected the field where the seed was being grown on July 13, July 26, and September 3, 2015, which indicated no problems with the seed crop. On or about September 3, 2015, Miller "killed the vines" in anticipation of and as required to harvest the seed crop. Miller harvested the seed crop between September 18 and September 25, 2015, and the harvested seed crop was immediately taken from the field to Miller's storage facility south of Minto.

[¶4]   On December 31, 2015, Miller and Johnson entered into a contract for the sale of seed potatoes, specifically to purchase "10,400 CWT - ND CERTIFIED BULK DARK RED NORLAND SEED POTATOES GENERATION 3." The contract for sale disclaimed any express or implied warranty of merchantability or fitness for a particular purpose and contained a limitation of consequential damages and remedies, stating in part:

> The agreed EXCLUSION AND LIMITATION OF CERTAIN WARRANTIES –
> Due to the fact that seed potatoes are perishable vegetative tuber-seeds; unstable under certain conditions; easily contaminated or

damaged through handling, shipment, storage, cutting, treating or planting; devitalized or weakened by mishandling or planting during unfavorable or moisture conditions and because the handling, use, sanitation, cropping, germination, quality after shipping, and physical possession of the seeds are far beyond the control of the producer, SELLER, shipper or regulatory inspectors, including the Federal-State Inspection Service, State Seed Certification Agency, State Department of Agriculture, the following EXCLUDED AND LIMITED WARRANTIES ARE OFFERED FOR THE SEED POTATOES SOLD BY THIS AGREEMENT:

a.) The SELLER and the producer represent that the seed potatoes sold and to be shipped by this agreement conform to the label (seed tag) description as required by the Seed State of Origin and/or Federal-State Inspection Laws, and will conform to the requirements specified by the North Dakota State Seed Department, and

b.) THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF. THE SELLER AND THE PRODUCER MAKE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, FREEDOM FROM ANY LATENT POTATO DISEASE, VIRUS OR DISORDER OF ANY NATURE, OR OTHERWISE, AND IN ANY EVENT LIABILITY FOR BREACH OF ANY WARRANTY OR CONTRACT WITH RESPECT TO SUCH SEEDS IS LIMITED TO THE ACTUAL PURCHASE PRICE.

The agreed LIMITATION OF CONSEQUENTIAL DAMAGES AND REMEDIES –
ANY DAMAGES ARISING OUT OF THIS CONTRACT SHALL BE LIMITED IN ALL EVENTS TO THE RETURN OF THE ACTUAL PURCHASE PRICE PAID FOR SUCH SEEDS ON THAT PORTION OF THE SEED POTATOES ON WHICH A COMPLAINT MAY ARISE. THE SELLER OR PRODUCER SHALL NOT BE LIABLE FOR PROSEPCTIVE PROFITS OR SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES. THE

RETURN OF THE ACTUAL PURCHASE PRICE PAID FOR SUCH SEEDS IS THE EXCLUSIVE AND SOLE REMEDY AVAILABLE TO THE BUYER OR USER OF THESE SEED POTATOES.

Under the contract Johnson paid $104,000 for the seed potatoes. Johnson picked up the seed potatoes in May 2016.

[¶5]   In June or July 2016, Johnson informed Miller of problems with some of the seed potatoes he had purchased. Johnson stated an analysis definitively showed very high levels of the herbicide glyphosate, which caused the problems with the seed potatoes. The seed potatoes did not grow properly, and Johnson alleged damages as a result. It is undisputed that the seed potatoes were damaged because an employee of Miller inadvertently contaminated the seed potatoes with glyphosate while they were growing on Miller's Farm. Miller asserts that the glyphosate product was applied inadvertently by Miller's employee, likely at the time the vines were killed and the seed harvested.

[¶6]   In July 2016, Miller sought coverage for the loss from Nodak. On July 12, 2016, Nodak sent Miller a letter denying coverage and citing a policy exclusion, which the parties herein have alternately referred to as the "seed performance" or "failure to conform" exclusion. In October 2017, Johnson sent Miller a written demand for losses totaling $365,593.45. Miller personally reimbursed Johnson for this amount in full.

[¶7]   In December 2018, Miller commenced this action against Nodak seeking damages after Nodak refused to provide coverage under the insurance policies for Miller's claim relating to damaged seed potatoes. Miller sought damages from Nodak in excess of $421,890.18, alleging breach of contract, negligence, unjust enrichment, and bad faith. Nodak answered, denying Miller's claims and maintaining denial of coverage was proper.

[¶8]   In May 2019, Nodak moved for summary judgment arguing that Nodak properly denied coverage under an exclusion to coverage when it denied Miller's claim, was not negligent, and acted in good faith in denying the claim. Miller made a cross-motion for summary judgment on its claims for breach of

contract, negligence, unjust enrichment, and bad faith. In January 2020, the district court denied both parties' motions for summary judgment.

[¶9] In April 2020, Nodak moved for reconsideration and clarification. In its December 2020 order, the district court granted summary judgment to Nodak on Miller's claims for negligence and unjust enrichment but held the exclusions relied on by Nodak to preclude Miller's claim for coverage were inapplicable. In August 2021, the court held a bench trial at which the parties' stipulated exhibits were admitted into evidence and the issue of calculating damages was taken under advisement.

[¶10] In November 2021, the district court issued its findings of fact, conclusions of law, and order for judgment. The court found the parties had agreed on the record that Miller was no longer pursuing the bad faith claim originally raised in the complaint. The court held Miller's contract with Johnson limited damages in this matter to the stipulated contract price paid of $104,000 and the insurance policy did not require Nodak to compensate Miller beyond the contractual liability. The court awarded statutory pre-judgment interest at a rate of 6 percent beginning November 1, 2017.

[¶11] A final judgment was subsequently entered awarding Miller damages of $104,000, plus pre-judgment interest of $25,216.44, for a total award of $129,216.44.

II

[¶12] Our standard for reviewing a district court's summary judgment decision is well established:

> In deciding whether the district court appropriately granted summary judgment, we view the evidence in the light most favorable to the opposing party, giving that party the benefit of all favorable inferences which can reasonably be drawn from the record. A party opposing a motion for summary judgment cannot simply rely on the pleadings or on unsupported conclusory allegations. Rather, a party opposing a summary judgment motion must present competent admissible evidence by affidavit or other comparable means that raises an issue of material fact and must,

4

if appropriate, draw the court's attention to relevant evidence in the record raising an issue of material fact. When reasonable persons can reach only one conclusion from the evidence, a question of fact may become a matter of law for the court to decide. A district court's decision on summary judgment is a question of law that we review de novo on the record.

*N. Star Mut. Ins. v. Ackerman*, 2020 ND 73, ¶ 6, 940 N.W.2d 857 (quoting *Dahms v. Nodak Mut. Ins. Co.*, 2018 ND 263, ¶ 6, 920 N.W.2d 293). The district court also made findings of fact and conclusions of law after the August 2021 bench trial, which this Court reviews as follows:

> In an appeal from a bench trial, the district court's findings of fact are reviewed under the clearly erroneous standard of review, and its conclusions of law are fully reviewable. . . . In a bench trial, the district court is the determiner of credibility issues and we will not second-guess the district court on its credibility determinations. Findings of the trial court are presumptively correct.

*Pavlicek v. Am. Steel Sys., Inc.*, 2022 ND 35, ¶ 6, 970 N.W.2d 171 (quoting *Gimbel v. Magrum*, 2020 ND 181, ¶ 5, 947 N.W.2d 891 (cleaned up)).

### III

[¶13] Nodak contends Miller's damages are the result of activities excluded from coverage under the applicable Nodak policy.

[¶14] Interpretation of an insurance policy presents a question of law, reviewed de novo on appeal. *N. Star Mut. Ins.*, 2020 ND 73, ¶ 7. We independently examine the insurance contract to decide whether coverage exists, construing policy language to give effect to the parties' mutual intention at the time of contracting. *Borsheim Builders Supply, Inc. v. Manger Ins., Inc.*, 2018 ND 218, ¶ 8, 917 N.W.2d 504. In interpreting an insurance policy:

> We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the

contract. While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

*Dahms*, 2018 ND 263, ¶ 8 (quoting *Borsheim Builders*, at ¶ 8). "Exclusions from coverage must be clear and explicit and are strictly construed against the insurer." *N. Star Mut. Ins.*, at ¶ 7. Although exclusionary clauses are strictly construed, an insurance contract will not be rewritten to impose liability when the policy language unambiguously precludes coverage. *Borsheim Builders*, at ¶ 8; *Forsman v. Blues, Brews & Bar-B-Ques, Inc.*, 2017 ND 266, ¶ 10, 903 N.W.2d 524.

[¶15] This Court first examines a policy's coverages before examining its exclusions; and if a coverage provision applies to the harm at issue, we examine the policy's exclusions and limitations of coverage. *Borsheim Builders*, 2018 ND 218, ¶ 9. "While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." *Id.* at ¶ 10 (quoting *Forsman*, 2017 ND 266, ¶ 11).

IV

[¶16] The relevant Nodak Farm and Ranch policy provides, in part:

SECTION II – LIABILITY COVERAGES
A.    Coverage L – Personal Liability
    If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, "we" will:
    1.    Pay up to "our" limit of liability for the damages *for which an "insured" is legally liable*; and
    2.    Provide a defense at "our" expense by counsel of "our" choice, even if the suit is groundless, false or

6

fraudulent. "We" may investigate and settle any claim or suit that "we" decide is appropriate. "Our" duty to settle or defend ends when "our limit of liability for the "occurrence" has been exhausted by payment of a judgment or settlement.

(Emphasis added.) The policy defines an "[o]ccurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in . . . '[p]roperty damage'." "'Property [d]amage' means "injury to or destruction of tangible property including the loss of use of this property." The policy further provides:

SECTION II – EXCLUSIONS
. . . .
F.    Coverage L – Personal Liability
       Coverage L does not apply to:
       . . . .
       2.    "Property damage" to property owned by an "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location";
       . . . .
       8.    Loss including consequential, incidental, or derivative loss of any type, arising out of failure of seed sold by an "insured" to conform to the variety or quality specified by the "insured", or to be suitable for the purpose specified by the "insured", or to be free of disease, bacteria, fungi, or similar conditions. The term "seed" will include seeds, bulbs, plants, roots, tubers, cuttings, or other similar means of plant propagation;
       . . . .

V

[¶17] On appeal, Nodak argues the district court erred in entering judgment against Nodak in light of the insurance policy's "failure to conform" exclusion; in light of the policy's "property damage" exclusion; and based on Miller's

7

gratuitous payment to Johnson, made without Nodak's knowledge or permission. Nodak argues the court erred in finding in favor of Miller and awarding Miller $104,000 in damages plus pre-judgment interest. In the cross-appeal, Miller maintains the court correctly awarded monetary damages to Miller but erred in deciding the amount of damages are limited by the contract's terms to the purchase price of the seed that Miller provided to Johnson.

A

[¶18] While the parties do not raise any separate issues as to whether coverage under the policy was initially triggered, we nonetheless conclude the aforementioned "seed performance" or "failure to conform" exclusion is dispositive.

[¶19] This exclusion provides that Coverage L does not apply to:

8. Loss including consequential, incidental, or derivative loss of any type, arising out of failure of seed sold by an "insured" to conform to the variety or quality specified by the "insured", or to be suitable for the purpose specified by the "insured", or to be free of disease, bacteria, fungi, or similar conditions. The term "seed" will include seeds, bulbs, plants, roots, tubers, cuttings, or other similar means of plant propagation[.]

[¶20] Nodak argues the district court erred in concluding Miller did not specify the quality of seed potatoes and erred in holding that "quality" referred only to the grade of the seed potatoes. Nodak argues that an inherent quality of seed potatoes is the ability to successfully grow a new plant. Nodak contends that because the seed potatoes Miller sold to Johnson did not conform to this quality, this exclusion applies to preclude coverage.

[¶21] Nodak also argues the district court erred in holding Miller did not specify a specific purpose for the seed potatoes under the contract. Nodak contends that if the court is correct and Miller did not hold the seed out as suitable for a particular purpose, then under the contract terms Miller would have no liability to Johnson because he did not breach the contract. Miller

8

would not be "legally liable" to Johnson and Nodak would have no duty to pay his claim. Nodak further argues, however, that if the district court is wrong and Miller did hold the seed out as suitable for a specified purpose, *i.e.*, that the seed would grow, coverage would be precluded under the policy's exclusion.

[¶22] Miller responds that the seed Miller sold to Johnson conformed to the variety and quality specified by Miller, in that the seed in question met "First Grade Blue Tag" seed in all respects, which is what Johnson contracted for. Miller asserts the North Dakota State Seed Department's repeated inspections and certification verify this and Miller made no other specification, warranty, or promise to Johnson regarding the variety or quality of seed. Miller contends all such matters were specifically disclaimed by the seed potato contract's terms and by operation of North Dakota law. Miller asserts no specification, warranty, or promise regarding suitability or purpose of the seed was made; and the contract did not state that the seed potatoes were suitable for a particular purpose, other than they were First Grade Blue Tag seed potatoes.

[¶23] Here, in denying summary judgment, the district court held this exclusion did not apply because there was "no allegation that the seed potato was not of the variety specified by Miller" and because "[t]he contract between Miller and Johnson specifically indicated Miller did not hold the seed out as suitable for a particular purpose." In its subsequent order on reconsideration and clarification, the court again held this exclusion did not apply. The court agreed with Miller that the lack of specific warranty did not necessarily insulate Miller from all claims, even if it likely precluded a claim for breach of warranty. The court held the contract between Miller and Johnson contained express disclaimers and the language in Nodak's policy did not just require a failure to meet a purpose, but a failure to meet a "purpose specified."

[¶24] In reaching its conclusion, the district court also relied on a case from the Minnesota Court of Appeals, which held that "quality specified" in an exclusion meant the "certified seed potato grade specified in a sale transaction" or, at the very least, was an ambiguous term to be strictly construed against the insurer. *Bob Useldinger & Sons, Inc. v. Hangsleben*, 483 N.W.2d 495, 499 (Minn. Ct. App. 1992), *rev'd*, 505 N.W.2d 323 (Minn. 1993). While

acknowledging the case had been reversed on appeal, the district court found the court of appeals' rationale more persuasive.

[¶25] In *Bob Useldinger & Sons, Inc. v. Hangsleben*, 505 N.W.2d 323, 327 (Minn. 1993), however, the Minnesota Supreme Court rejected the lower court's narrow interpretation of "quality specified" to only the seed grade. The court concluded, "The potatoes were to be grown to the specifications of a potato chip producer, and the seed did not fulfill this purpose or expectation. Therefore, the seed failed to conform to the 'quality specified.'" *Id.* We similarly reject the district court's narrow construction in this case of the terms "quality specified" and "purpose specified," as they are used in the exclusion here.

[¶26] On our review of the policy language, we conclude this exclusion applies and precludes coverage under the facts established in this case, because the claimed losses arise directly from failure of the seed potatoes sold by Miller, *i.e.*, Miller's sale of defective seed. We disagree with Miller's assertion that the sale contract between Miller and Johnson applies to disclaim any specified quality or suitability of purpose of the seed potatoes sold to Johnson and thus operates to defeat the exclusion.

[¶27] In construing this exclusion as a whole, we first observe the exclusion's language defining "loss" to include "consequential, incidental, or derivative loss *of any type*." (Emphasis added.) We next note the exclusion's language defining "seed" to include "seeds, bulbs, plants, roots, tubers, cuttings, or *other similar means of plant propagation*." (Emphasis added.) The exclusion's use of the word "seed" at its core contemplates "plant propagation." We therefore reject Miller's contention that the exclusion's use of the terms "quality specified" only refers to the seed grade. We further reject Miller's contention that the seed potato contract's broad warranty disclaimers operate to nullify the exclusion's use of the language "purpose specified," because Miller sold Johnson seed potatoes for the minimal purpose of plant propagation.

[¶28] It is undisputed here that the seed potatoes did not grow properly, that the claimed losses were to Johnson's crop yield, and that Miller's payment to Johnson included losses beyond the seed purchase price. The underlying losses

10

at issue, as Miller paid to Johnson, included both the expectation of growth from the seed potatoes and profits from the sale of fully-grown potatoes. The undisputed defective condition of the seed potatoes at the time of Miller's sale to Johnson goes both to the specified "quality" and "purpose" of the seed as a viable seed capable of plant propagation. Based on this exclusion's plain language, we conclude Nodak's policy did not provide coverage for the claimed losses arising out of the failure of the defective seed potatoes sold by Miller to Johnson.

[¶29] Applying this exclusion, therefore, we conclude coverage under the policy is precluded for Johnson's claims against Miller. We hold the district court erred in finding coverage and reverse the judgment.

## B

[¶30] In the cross-appeal, Miller argues the district court erred in calculating damages. Miller contends the court incorrectly held Miller's damages are limited by the seed contract's terms to the purchase price of the seed provided by Miller to Johnson. Because we conclude coverage is precluded under the relevant policy's exclusion, Miller's cross-appeal is moot.

## VI

[¶31] We have considered the parties' remaining arguments and deem them either without merit or unnecessary to our decision. The judgment is reversed.

[¶32] Jon J. Jensen, C.J.
Daniel J. Crothers
Jerod E. Tufte
Douglas A. Bahr

[¶33] The Honorable Daniel S. El-Dweek, D.J., sitting in place of McEvers, J., disqualified.

11

**El-Dweek, District Judge, dissenting.**

[¶34] I believe the exclusion does not apply; therefore, I would affirm the district court and respectfully dissent from the majority opinion.

[¶35] The majority aptly points out that "[e]xclusions from coverage must be clear and explicit and are strictly construed against the insurer." *Majority*, at ¶ 14 (quoting *N. Star Mut. Ins.*, 2020 ND 73, ¶ 7). The policy exclusion in question is reproduced. Majority, at ¶ 16. This exclusion is neither clear nor explicit with respect to the denial of coverage in this case. There is nothing that clearly or explicitly denies coverage due to the accidental exposure of seeds to glyphosate. The majority has shoehorned this clearly and indisputably accidental occurrence into the term "quality" contained in this exclusion. Accordingly, the majority's opinion belies this Court's prior decisions requiring exclusions to be strictly construed against the insurer. Instead, it finds a meaning of the word "quality" that is beyond its plain and ordinary meaning. "If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract." *Martin v. Allianz Life Ins. Co.*, 1998 ND 8, ¶ 9, 573 N.W.2d 823 (citing *Sellie v. N.D. Ins. Guar. Ass'n*, 494 N.W.2d 151, 156-57 (N.D. 1992)).

[¶36] The North Dakota Supreme Court has not previously discussed the issue of quality as it relates to this case. However, other states have specifically discussed seed quality. It is my opinion quality more accurately relates to grade than to condition. In *Moorer v. Hartz Seed Co.*, 120 F. Supp. 2d 1283, 1287 (M.D. Ala. 2000), seed is referred to as "certified *quality* or better." (Emphasis added.) The court in *Moorer* recognized that quality related to the certified nature of the seed, and not to its condition due to accidental herbicide spray. In *Anderson v. Thomas*, 336 P.2d 821 (Kan. 1959), quality is referred to as grade of seed. The question in *Anderson* is whether "Blue Tag Quality" seeds were delivered to the purchaser. Once again, quality of seed refers to the grade, and not the condition, of a seed after it has been accidentally sprayed with glyphosate.

[¶37] Given these examples of cases where quality meant grade of seed, as well as our developed case law that exclusions are to be strictly construed against

12

the insurer, this Court ought to strictly construe the term "quality" to mean grade of seed. Given this construction, the term "quality" should not provide the basis for denial of coverage because seeds were accidentally sprayed with glyphosate. What is clear is this policy exclusion is meant to exclude coverage against a claim of an injured party receiving an inferior grade of seed than contracted, and not due to damage caused by the accidental exposure of these seeds to glyphosate. To hold differently requires a strained reading of the word "quality."

[¶38]  I respectfully dissent.

[¶39]  Honorable Daniel S. El-Dweek, D.J.